UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

JENNIFER ADAMCZAK and
MICHAEL ADAMCZAK,
          Plaintiffs,

v.                                    Case No. 19-CV-1596

VILLAGE OF GREENDALE,
RYAN ROSENOW,
and TODD MICHAELS,
          Defendants.

## DECISION AND ORDER

Jennifer Adamczak works for the Village of Greendale Police Department (GPD) as a dispatcher. Her husband, Michael Adamczak, was a police sergeant with the GPD. They bring this action against the Village of Greendale for retaliation in violation of the Americans with Disabilities Act (ADA) and against Greendale Police Chief Ryan Rosenow and Greendale Village Manager Todd Michaels for retaliation in violation of the First Amendment under § 1983. Defendants move for summary judgment.

### I. BACKGROUND

I present the facts in the light most favorable to the plaintiffs, drawing all reasonable inferences in their favor. *See Tolan v. Cotton*, 134 S. Ct. 1861, 1863 (2014); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Jennifer suffers from a heart condition which prevents her from working between the hours of midnight and 7:00 A.M. In December of 2014, Jennifer and Michael filed a lawsuit under the ADA against the Village of Greendale alleging discrimination against Jennifer based on her heart condition and retaliation against Jennifer and Michael (the "2014 lawsuit"). Among other forms

retaliation, the Adamczaks alleged that then-Police Chief Robert Malasuk gave Jennifer and Michael poor performance reviews which resulted in neither receiving a raise for several years. The 2014 lawsuit was mediated on January 25, 2018, and the parties came to a settlement. The settlement did not provide for an increase in the Adamczaks' pay. After the mediation, Village Manager Todd Michaels told Jennifer that he would "make everything right" for the Adamczaks which Jennifer understood to mean that her pay would be substantially increased. On February 21, 2018 the parties signed a Waiver and Release of All Claims which fully released and discharged, "any and all claims, demands, actions, rights, obligations, damages, costs, liabilities, or causes of actions ("collectively claims"), arising out of or relating in any way to events occurring prior to and including the date of January 27, 2018." ECF no. 20 ¶15.

### A. Jennifer Adamczak

In February of 2018, Village Manager Michaels and Chief Rosenow met with Jennifer and told her that, beginning on January 1, 2019, they would raise her pay to the top of the pay scale for dispatchers. Later in February of 2018, Rosenow told Jennifer that he did not like being questioned in the 2014 lawsuit. By January 11, 2019, Jennifer's pay still had not been increased. When Jennifer asked Michaels when she would be raised to the top of the pay scale, Michaels told her that her pay had not been adjusted because the 2018 wage review process had not been completed but that any changes would be made retroactive to January 1, 2019.

On March 12, 2019, before any changes were made to Jennifer's pay, Rosenow contacted Jennifer and asked if she could lift her work restrictions so that she could cover a shift from 4:00 A.M. to 8:00 A.M. Jennifer did not respond to Rosenow's request and

2

Case 2:19-cv-01596-LA    Filed 09/24/21    Page 2 of 18    Document 37

retaliation, the Adamczaks alleged that then-Police Chief Robert Malasuk gave Jennifer and Michael poor performance reviews which resulted in neither receiving a raise for several years. The 2014 lawsuit was mediated on January 25, 2018, and the parties came to a settlement. The settlement did not provide for an increase in the Adamczaks' pay. After the mediation, Village Manager Todd Michaels told Jennifer that he would "make everything right" for the Adamczaks which Jennifer understood to mean that her pay would be substantially increased. On February 21, 2018 the parties signed a Waiver and Release of All Claims which fully released and discharged, "any and all claims, demands, actions, rights, obligations, damages, costs, liabilities, or causes of actions ("collectively claims"), arising out of or relating in any way to events occurring prior to and including the date of January 27, 2018." ECF no. 20 ¶15.

### A. Jennifer Adamczak

In February of 2018, Village Manager Michaels and Chief Rosenow met with Jennifer and told her that, beginning on January 1, 2019, they would raise her pay to the top of the pay scale for dispatchers. Later in February of 2018, Rosenow told Jennifer that he did not like being questioned in the 2014 lawsuit. By January 11, 2019, Jennifer's pay still had not been increased. When Jennifer asked Michaels when she would be raised to the top of the pay scale, Michaels told her that her pay had not been adjusted because the 2018 wage review process had not been completed but that any changes would be made retroactive to January 1, 2019.

On March 12, 2019, before any changes were made to Jennifer's pay, Rosenow contacted Jennifer and asked if she could lift her work restrictions so that she could cover a shift from 4:00 A.M. to 8:00 A.M. Jennifer did not respond to Rosenow's request and

the two did not discuss the matter again. Jennifer was never placed on a shift that violated her medical restrictions. On March 19, 2019, Greendale issued its 2019 Salary and Benefit Resolution which included a merit-based raise for Jennifer based on her 2018 performance evaluation but did not raise her to the top of the pay scale for dispatchers.

Between January of 2018 and March of 2019, Jennifer was the primary trainer of three other dispatchers. "Trainer" is an informal position and does not include an increase in pay. After Rosenow asked Jennifer if she could have her medical restrictions lifted in March of 2019, Jennifer was not assigned to be the primary trainer of other dispatchers. She has, however, filled in as a trainer when the primary trainer is not on duty. Since March of 2019, neither Jennifer nor any other dispatcher has been asked to sit on interview panels for new candidates.

### B. Michael Adamczak

On January 23, 2018, Michael applied for an open lieutenant position in the GPD. The interview process took place after January 27, 2018. Prior to the hiring process, Rosenow announced that the candidate who finished second would be placed on first shift to oversee the detective bureau, beginning a two-year schedule of sergeants rotating through first shift. Michael normally worked second shift at this time. The candidates were interviewed by a panel consisting mostly of police captains from nearby municipalities. Neither Rosenow nor Todd Michaels sat on the interview panel. The two candidates who scored the highest based on their interview with the panel were interviewed personally by Rosenow.

Michael received the fourth highest score based on his interview with the panel and was not interviewed by Rosenow. After the interview process, Rosenow accused

Michael of not taking the application process seriously, pointing out that Michael's cover letter contained multiple errors: the letter misstated the year as 2013, was addressed to the previous police chief, and misstated how many years of experience Michael had as a sergeant. Donald Kloss, a sergeant with less experience than Michael, was promoted to lieutenant. Jason Thompson, who received the second highest score in the interview process, was placed on first shift to begin the two-year rotation.

Jason Thompson later told Michael that Thompson had threatened to quit if he was not taken off third shift and that Rosenow had moved Thompson to first shift to appease him. After hearing this, Michael filed a request to be moved to first shift which Rosenow denied because there was no opening for a sergeant on the first shift.

Frustrated with his level of pay and assignment to second shift, Michael notified Rosenow on November 30, 2018 that he intended to retire on January 27, 2019. Four days later, Michael informed Rosenow he wanted to rescind his retirement notice because he had learned that retiring early in the year would negatively impact his benefits. Rosenow responded in "an angry manner" and told Michael that the Village did not have to honor his recission. Soon after, the Adamczaks met with Village Manager Michaels and Rosenow at the Village Hall. During the meeting, Michaels and Rosenow told the Adamczaks, while laughing, that they just wanted to part ways and that the Village had only paid $10,000 as a result of the 2014 lawsuit. Michaels then told the Adamczaks he would have to check with the Village's labor attorney before deciding if he would accept Michael's recission. After the meeting, Todd Michaels called Michael and asked when he would like to retire. The two agreed on a retirement date of October 23, 2019.

4

In February of 2019, Michael requested permission to attend motorcycle training but his request was denied because no one was available to cover his shift during the training. At some point between Michael's request and the date of the training, Lieutenant Kloss became available to cover Michael's shift but the schedule was not changed and Michael did not attend the training. Missing the training did not affect Michael's duties and he was allowed to continue to ride a motorcycle until his retirement.

In October of 2019, on the Thursday before Michael's retirement, Rosenow presented Michael with a cake and a plaque in honor of his retirement. A short time later, in January of 2020, an officer with less experience than Michael retired from GPD and was thrown a larger retirement party.

## II. DISCUSSION

Summary judgment is required where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When considering a motion for summary judgment, I view the evidence in the light most favorable to the non-moving party and must grant the motion if no reasonable juror could find for that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 255 (1986). Defendants dispute some of the facts as presented, but I cannot resolve fact disputes on summary judgment.

### A. 2018 Waiver and Release of Claims

Defendants argue that the waiver and release signed by the plaintiffs in 2018 prevents plaintiffs from bringing claims related to low pay if the claims arise out of events prior to January 27, 2018. Plaintiffs agree that claims arising out of events prior to January 27, 2018, are waived but assert that their wage related claims arise out of later events.

Many of plaintiffs' arguments center on the fact that Jennifer and Michael received relatively low pay, given their experience at their positions, even after they signed the waiver and release of claims. The record is clear, however, that the reason for their relatively low pay is that they were denied raises for several years prior to the 2014 lawsuit and they have waived claims arising from these events. The plaintiff's claims based generally on "low pay" have therefore been waived. To the extent plaintiffs argue they were denied raises after January 27, 2018, I will consider their claims.

**B. Retaliation Under the ADA**

Under the ADA, an employer may not retaliate against an employee for opposing any act or practice made unlawful by the ADA. 42 U.S.C. § 12203(a). To succeed in a claim for retaliation, "the employee must show '(1) he engaged in a statutorily protected activity; (2) he suffered an adverse action; and (3) a causal connection between the two.'" *Silk v. Bd. of Trs.*, 795 F.3d 698, 710 (7th Cir. 2015) (quoting *Dickerson v. Bd. of Trs.*, 657 F.3d 595, 601 (7th Cir. 2011)). The central question is "whether the evidence [considered as a whole] would permit a reasonable factfinder to conclude" that the statutorily protected activity caused the adverse employment action. *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016); see also *Lewis v. Wilkie*, 909 F.3d 858, 867 n. 2 (7th Cir. 2018) (noting that *Ortiz* applies to both discrimination and retaliation claims). The protected activity must be "a but-for cause of the adverse employment action." *Serwatka v. Rockwell Automation, Inc.*, 591 F.3d 957, 963 (7th Cir. 2010). "[A] plaintiff may . . . supply the causal link through circumstantial evidence from which a jury may infer" retaliation. *Greengrass v. Int'l Monetary Sys. Ltd.*, 776 F.3d 481, 486 (7th Cir. 2015). "Such circumstantial evidence may include suspicious timing, ambiguous

statements of animus, evidence other employees were treated differently, or evidence the employer's proffered reason for the adverse action was pretextual." *Id.*

Here, the plaintiffs engaged in statutorily protected activity, which the defendants do not dispute. Both Michael and Jennifer brought the 2014 lawsuit to oppose what they alleged was unlawful disability discrimination.

### 1. Jennifer Adamczak

Jennifer alleges three possible adverse actions: (1) Michaels broke his promise to raise her to the top of the pay scale for dispatchers; (2) she was removed from her informal position as primary trainer; and (3) she was removed from interview panels.

Jennifer cannot show a causal link between Michaels' broken promise and a statutorily protected activity. The only evidence of Michaels' retaliatory intent is the fact that Michaels' failure to deliver on his promise occurred after the lawsuit. Typically, for an inference of causation to be drawn solely on the basis of suspicious timing an adverse action must occur no more than a few days after the protected activity. *Igaski v. Illinois Department of Financial and Professional Regulation*, 988 F.3d 948, 960 (7th Cir. 2021). Here, both the promise to raise Jennifer's salary and the failure to do so occurred years after the lawsuit was filed. Additionally, the very fact that the promise and the decision to renege both occurred *after* the 2014 lawsuit was filed weighs heavily against any inference that the lawsuit motivated the decision to renege.

Plaintiffs argue that Jennifer's refusal to lift her medical restrictions at Rosenow's request occurred shortly before her pay was adjusted and could have prompted the decision not to raise her to the top of the pay scale. There are two problems with this argument. First, plaintiffs do not argue that Jennifer's refusal to lift her medical restrictions

7

was a statutorily protected activity. Instead plaintiffs argue that because Jennifer's medical restrictions were at issue in the 2014 lawsuit, any action taken because of Jennifer's refusal to lift her restriction is in some way motivated by the lawsuit. I disagree. Evidence that a decision was motivated by Jennifer's refusal to lift her medical restrictions is simply not evidence that it was motivated by the filing of lawsuit five years earlier, regardless of the overlap in subject matter.

The second problem is that Rosenow was not involved in adjusting Jennifer's pay and plaintiffs do not point to evidence that Rosenow informed Michaels, or anyone else, of Jennifer's refusal to lift her medical restrictions. Plaintiffs argue that although Rosenow did not set the pay of dispatchers, he could have "made suggestions" to Michaels about raising Jennifer's pay. This argument is irrelevant as there is no evidence that Rosenow was actually involved in any decisions to modify Jennifer's pay. Taken as a whole, the evidence is insufficient for a reasonable jury to find that the 2014 lawsuit was a but-for cause of Michaels' broken promise to raise Jennifer's pay to the top of the pay scale.

Plaintiffs' argument that the reduction of Jennifer's duties was an adverse action caused by the 2014 lawsuit similarly fails. Jennifer was removed from primary trainer duties and taken off interview panels shortly after she refused to have her restrictions lifted, but again plaintiffs do not argue this was a statutorily protected activity. In February of 2018, Rosenow did express anger at being questioned in the course of the 2014 lawsuit, which could allow an inference of a retaliatory motive. However, the allegedly retaliatory events did not take place until 13 months after this statement.[1] Additionally,

---

[1] At certain points, plaintiffs seem to argue that Rosenow expressed frustration at being questioned in the lawsuit several times but they give only a single date for these comments: February of 2018. As such, I will consider the comments as taking place on this date.

Rosenow first placed Jennifer on training duty in January of 2018, four years after the 2014 lawsuit was filed. The fact that Jennifer was both granted the training duties and removed from the training duties after the 2014 lawsuit was filed weighs heavily against an inference that the 2014 lawsuit was a motivating factor for the decision to remove her from her training duties. When this is considered along with the 13-month delay after Rosenow's statement and the five-year delay after the filing of the lawsuit, a reasonable jury could not infer that that the 2014 lawsuit was a but-for cause of Rosenow's decision to reduce Jennifer's duties.

The reduction in Jennifer's duties also did not constitute a materially adverse employment action. An action is materially adverse if "a reasonably employee . . . would be dissuaded from engaging in the protected activity." *Roney v. Ill. Dep't of Trans.*, 474 F.3d 755, 461 (7th Cir. 2007). A *de facto* demotion can be a materially adverse employment action when it involves a wholesale change in duties. *Pierri v. Medline Industries, Inc.*, 970 F.3d 803, 808 (7th Cir. 2020). But a simple shift in the balance of job responsibilities is not necessarily adverse, particularly when the employee remains "in the same job position, in the same department, and at the same desk." *Id.* Generally, a reassignment of job responsibilities is not materially adverse "unless it represents a significant alteration to the employee's duties, which is often reflected by a corresponding change in work hours, compensation, or career prospects." *Stephens v. Erickson*, 569 F.3d 779, 791 (7th Cir. 2018). In this case, Jennifer's primary duties, job title, work hours and compensation remained the same, all of which indicates the change in her duties was a shift in the balance of job responsibilities rather than a *de facto* demotion. Jennifer does not argue the changes to her duties affected her career prospects.

Jennifer does argue that the reduction of her training responsibilities decreased her prestige, and reassignment to a less prestigious position can be considered an adverse action. *Koty v. DuPage County, Ill.*, 900 F.3d 515, 520 (7th Cir. 2018). Her only evidence of a loss of prestige, however, is her own testimony that she considered the decrease in her training hours to have resulted in a loss of reputation and status. This is not enough for a reasonable jury to conclude that the shifts in Jennifer's job duties, taken separately or together, could have dissuaded a reasonable employee from making or supporting a charge of discrimination.

### 2. Michael Adamczak

Michael alleges a number of possible adverse actions: (1) he was passed over for the lieutenant position; (2) a less experienced sergeant was placed on first shift instead of Michael; (3) his request to work first shift was denied; (4) he was closeted and isolated from any decision making processes; (5) his request to attend motorcycle training was denied; (6) Rosenow "belittled" Michael over the errors in his cover letter; (7) Rosenow responded angrily when Michael attempted to rescind his retirement; and (8) Michael did not receive as large a retirement party as a fellow employee.[2]

A failure to promote may be considered an adverse employment action. *See Malin v. Hospira, Inc.*, 762 F.3d 552, 558 (7th Cir. 2014). However, Michael does not offer any evidence that he was passed over because of the 2014 lawsuit. Rosenow expressed anger at being questioned in the 2014 lawsuit, which could allow an inference of retaliatory intent, but Rosenow was not involved in any decisions regarding Michael's

---

[2] Plaintiffs also reference Michael being removed from duties he had previously performed, such as interviewing dispatchers and police officers, but this took place under Chief Malasuk before January 27, 2018. Any claim based on these events has been waived.

candidacy for the lieutenant position. Only the two candidates who scored highest in the initial interview, which was conducted by a panel that included neither Rosenow nor Todd Michaels, were interviewed by Rosenow. Michael was not one of the two highest scoring candidates and was only evaluated by the panel.[3] Plaintiffs present no evidence that any member of the panel held any animus toward the Adamczaks or even knew of the 2014 lawsuit. Accordingly, a reasonable jury could not conclude that Michael was passed over because he filed the 2014 lawsuit.

Plaintiffs argue that Jason Thompson was moved to first shift, despite Michael having more experience, as a way to retaliate against Michael for the 2014 lawsuit. Defendants counter that Jason Thompson was moved to first shift only because he received the second highest scores in the lieutenant interview process and this is supported by the fact that Rosenow told participating sergeants before the interview process that the candidate who placed second would be placed on first shift. Plaintiffs do point to some evidence that defendants' stated reason was a pretext. Specifically, Jason Thompson told Michael that Thompson had been moved to first shift because he had threatened to quit if he was not moved from third shift. However, this is not evidence that the defendants' stated reason was a pretext for unlawful retaliation. Even if a jury were to fully credit Michael's testimony and conclude that Jason Thompson was moved to first shift because Thompson demanded the transfer and not because he finished second in the interview process, the jury could not conclude that Michael was passed over because of the 2014 lawsuit.

---

[3] Plaintiffs point out that the scores from the interview panel were never posted, but do not explain why this is relevant. Plaintiffs do not dispute that Michael finished fourth and there is no evidence on the record that the scores were inaccurate.

After Thompson was moved to first shift, Michael requested a transfer to first shift which plaintiffs argue was denied in retaliation for the 2014 lawsuit. Again, Rosenow's statement that he was angry about being questioned in the 2014 lawsuit does provide some evidence of retaliatory motive. However, defendants argue that the request was denied because Thompson was already the first shift sergeant and there was no open first shift assignment available. Plaintiffs do not dispute the fact that there was no open first shift assignment and do not argue that the defendants' stated reason was a pretext. Considering the evidence as a whole, a reasonable jury could not conclude that the 2014 lawsuit was a but-for cause of the denial of Michael's request.

Michael also argues that he was closeted and isolated from any decision-making processes. Michael's evidence of this, however, is unconvincing. Michael argues that no one visited his office on official business or socially, but does not say when this isolation began, whether it differed from the norm, or how it was caused by the filing of the 2014 lawsuit. Michael also points to the fact that he completed only mandatory in-house training but, again, does not explain how this differed from the norm or explain how it could be attributable to retaliatory intent. This evidence is insufficient for a reasonable jury to conclude he suffered an adverse employment action motivated by the filing of the 2014 lawsuit.

Plaintiffs also argue that Michael's request to attend motorcycle training was denied because of the 2014 lawsuit. The parties agree, however, that the request was denied because no one was available to cover Michael's shift on the day of the training. Plaintiffs argue that someone became available to cover Michael's shift at an unspecified time after his request, but this is not evidence that the request was denied because of the

2014 lawsuit. Considering the evidence as a whole, a reasonable jury could not conclude that the 2014 lawsuit was a but-for cause of the denial.

The remaining events, even taken together, do not rise to the level of a materially adverse employment action. Defendants do not dispute that Rosenow addressed Michael in an angry tone when Michael rescinded his retirement or that Michael did not receive as large a retirement celebration as other officers. But "petty slights, minor annoyances, and [a] simple lack of good manners" do not normally constitute adverse employment actions. *Formella v. Brennan*, 817 F.3d 503, 514 (7th Cir. 2016) (quoting *Burlington,* 548 U.S. at 68). Similarly, when Rosenow accused Michael of not taking the promotion process seriously and pointed out the multiple errors in Michael's cover letter, it was at worst a petty slight. A reasonable jury could not find that these events, taken separately or together, could have dissuaded a reasonable employee from making or supporting a charge of discrimination.

### B. First Amendment Retaliation

To establish a claim for retaliation in violation of the First Amendment, the plaintiff must show: (1) her speech was constitutionally protected; (2) she has suffered a deprivation likely to deter speech, and (3) her speech was at least a motivating factor in the employer's action. *Swetik v. Crawford*, 738 F.3d 818, 825 (7th Cir. 2010). Once the plaintiff shows that her conduct was constitutionally protected and that it was a motivating factor in the defendant's action against her, the burden shifts to the defendant to show that it would have taken the same action even in the absence of the protected conduct. *Yahnke v. Kane County, Il.*, 823 F.3d 1066, 1070-71 (7th Cir. 2016) (citing *Mt. Healthy City School Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977). In order for a public

13

Case 2:19-cv-01596-LA   Filed 09/24/21   Page 13 of 18   Document 37

employee's speech to be protected under the First Amendment, the employee must show: (1) she made the speech as a private citizen; (2) the speech addressed a matter of public concern; and (3) her interest in expressing that speech was not outweighed by the state's interests as an employer in promoting effectiveness and efficient public service. *Swetik*, 738 F.3d at 825 (quoting *Houskins v. Sheahan*, 549 F.3d 480, 490 (7th Cir. 2008).

### 1. Jennifer Adamczak

Plaintiffs argue that the filing of the 2014 lawsuit was protected speech. Generally, the filing of a lawsuit by a public employee is protected speech if the lawsuit addresses a matter of public concern. *Zorzi v. County of Putnam*, 30 F.3d 885, 896-97 (7th Cir. 1994); *see also Burough of Duryea v. Guarnieri*, 564 U.S. 379, 398 (2001) (adopting public concern test for both Petition Clause and Speech Clause). In this case, however, I need not decide whether the filing of the 2014 lawsuit was protected speech because plaintiffs have not produced evidence from which a reasonable jury could infer that it was a motivating factor in actions likely to deter the exercise of free speech.

Plaintiffs' claim that Michaels' broken promise to raise Jennifer to the top of the pay scale because of the 2014 lawsuit fails for the same reason it did under the ADA standard: both the promise and the decision not to raise Jennifer's pay occurred years after the filing of the suit. A reasonable jury could not infer from the evidence taken as a whole that the decision not to raise Jennifer's pay was motivated by the filing of the 2014 lawsuit.

Plaintiffs' argument that Jennifer's duties were reduced because of the filing of the 2014 suit also fails for the same reason it did under the ADA standard. These actions took place years after the lawsuit was filed and although Rosenow expressed anger at being

questioned in the 2014 lawsuit this occurred over a year before Jennifer's duties were reduced. Additionally, the training duties were both granted to Jennifer and reduced after the filing of the 2014 lawsuit. A reasonable jury could not infer from the evidence taken as a whole that that the 2014 lawsuit was a motivating factor in Rosenow's decision to reduce Jennifer's duties.

### 2. Michael Adamczak

Even if the filing of the 2014 suit was protected speech, plaintiffs cannot show that any of the allegedly retaliatory actions taken against Michael were both motivated by the 2014 lawsuit and sufficient to prevent an ordinary person from exercising his First Amendment rights.

Plaintiffs argue that Todd Michaels had the authority to grant Michael a raise but nonetheless chose not to, citing *Power v. Summers* for the proposition that even the denial of a discretionary raise can deter the exercise of free speech. 226 F.3d 815, 821 (7th Cir. 2000). The raise in question in *Power*, however, was an expected catch-up raise which most employees received. *Id.* Here, there is no evidence that similar raises were given to most employees or that Michael had any reason to expect such a raise. A reasonable jury could not find that failing to receive a raise when one had no reason to expect a raise would prevent an ordinary person from exercising his First Amendment rights.

Plaintiffs again argue that the failure to promote Michael to the lieutenant position was motivated by his filing of the 2014 lawsuit and their argument fails for the same reason it did under the ADA. Michael did not make it past the panel interview in the promotion process. Neither Rosenow nor Todd Michaels were on the interview panel and

15

there is no evidence that anyone on the panel knew about the 2014 lawsuit. Based on the evidence a reasonable jury could not infer that the 2014 lawsuit was a motivating factor in the failure to promote Michael to lieutenant.

Plaintiffs also argue that Michael was passed over in favor of Thompson for the first shift assignment because of the 2014 lawsuit. Rosenow's anger at being deposed in the 2014 lawsuit could allow a reasonable jury to infer retaliatory animus was a motivating factor. The burden therefore shifts to the defendants to show that the same decision would have been made in the absence of the protected activity. Defendants argue that Thompson was given the first shift assignment because he received the second highest score when interviewing for the lieutenant position and this is supported by the fact that, prior to the interview process, Rosenow informed the sergeants involved that the candidate who finished second would be placed on the day shift. Although plaintiffs point to some evidence that Thompson was moved to first shift to prevent him from quitting, this does not support an inference that the decision was made because of the 2014 lawsuit. Based on this evidence, a reasonable jury could not conclude that a different decision would have been made in the absence of the 2014 lawsuit.

Plaintiffs also argue that Michael's subsequent request to be moved to first shift was denied in retaliation for the 2014 lawsuit. Defendants counter that the reason Rosenow denied Michael's request was that there was no first shift assignment open. Plaintiffs do not dispute the fact that there was no first shift assignment open and do not argue that defendants' stated reason is a pretext. From this evidence, a reasonable jury could not conclude that a different decision would have been made absent the 2014 lawsuit.

Similarly, Michael's request to attend motorcycle training in 2019 was initially denied because there was no one available to cover Michael's shift. Michael does not dispute this fact. A reasonable jury could not conclude that a different decision would have been made absent the 2014 lawsuit.

Finally, Plaintiffs argue that Rosenow's anger in response to Michael's attempt to rescind his retirement, Rosenow's accusation that Michael did not take his application for the lieutenant position seriously, and the small the size of Michael's retirement party constituted retaliation under the First Amendment. It is true that "even minor forms of retaliation" can have a chilling effect on free speech and be actionable under the First Amendment. *Power*, 226 F.3d at 821. But petty harassment that is "so trivial that a person of ordinary firmness would not be deterred" from exercising their First Amendment rights is not actionable. *Massey v.* Johnson, 457 F.3d 711, 720 (7th Cir. 2006) (quoting *Piecynzski v. Duffy*, 875 F.2d 1331, 1333 (7th Cir. 1989)). These allegedly retaliatory events fall into the latter category and a reasonable jury could not find they would deter an ordinary firmness from exercising his rights.

Plaintiffs argue that the Seventh Circuit held in *Bart v. Telford* that even something as trivial as making fun of an employee for bringing a birthday cake to the office can be sufficient to deter the exercise of free speech. 677 F.2d 622, 624 (7th Cir. 1982). In *Bart*, however, the employee had suffered a campaign of petty harassments, including baseless reprimands. *Id.* at 624. The birthday cake incident was only one among many minor indignities which, considered in total, created a question of fact whether the campaign of harassment was actionable. *Id.* at 625. *Bart* also noted that "[i]t would trivialize the First Amendment to hold that harassment for exercising the right of free

speech was always actionable no matter how unlikely to deter a person of ordinary firmness from that exercise." *Id.* Here, Michael's supervisor reacted angrily when Michael attempted to rescind his resignation, pointed out mistakes in Michael's cover letter, and organized a smaller retirement party for Michael than he did for a coworker. These events do not constitute a campaign of harassment and even taken together a jury could not find they would be enough to deter an ordinary person from exercising his First Amendment rights.

### III. CONCLUSION

**THEREFORE, IT IS ORDERED** that defendants' motion for summary judgment (ECF No. 18) is **GRANTED**. The Clerk of Court shall enter final judgment.

Dated at Milwaukee, Wisconsin, this 24th day of September, 2021.

s/Lynn Adelman<br>
LYNN ADELMAN<br>
District Judge